**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KEVIN TERRANCE COIT, | : | |
| Plaintiff | : | No. 1:22-cv-01567 |
| | : | |
| v. | : | (Judge Kane) |
| | : | |
| R. MARSH, et al., | : | |
| Defendants | : | |

**MEMORANDUM**

Currently before the Court is Defendants' motion for summary judgment.  For the reasons set forth below, the Court will grant Defendants' motion due to pro se Plaintiff Kevin Terrance Coit ("Coit")'s failure to exhaust his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA").

**I.    BACKGROUND**

**A.    Coit's Complaint**

Coit, a convicted and sentenced state inmate and frequent litigant in this Court, commenced this action by filing a verified complaint which the Clerk of Court docketed on October 6, 2022.  (Doc. No. 1.)  Coit asserts claims under 42 U.S.C. § 1983 for alleged violations of his constitutional rights while he was incarcerated at Pennsylvania State Correctional Institution Frackville ("SCI Frackville").  See (Doc. Nos. 1–3, 11).  Coit names the following nine individuals as Defendants, all of whom allegedly were employed by the Commonwealth of Pennsylvania Department of Corrections ("DOC") in either its Central Office or at SCI Frackville from August through September 2022: (1) R. Marsh ("Marsh"), an "R.D.S."; (2) Malishik ("Malishik"), an "R.L.P.M."; (3) B. Snyder ("Snyder"), an "R.P.S.S."; (4) Ms. Britton ("Britton"), the Superintendent of SCI Frackville; (5) Mr. Wynder ("Wynder") and Kephart ("Kephart"), Deputies at SCI Frackville; (6) Ms. O'Mara ("O'Mara"), a "CCPM"; (7)

Wergynowic ("Wergynowic"), a Unit Manager at SCI Frackville; and (8) Wentzel ("Wentzel"), a Counselor at SCI Frackville.  See (id. at 1, 2–3).  Coit describes his Section 1983 claims against Defendants as follows: "Cruel and [u]nusual [p]unishment, [r]etaliation, [u]nconstitutional [c]onditions of [c]onfinement, [d]enial of intimate association, [Fourteenth] Amendment due process, First Amendment denial of access to the courts."  See (id. at 2).  For relief, he seeks monetary damages, attorney's fees, court costs, and "any other rewards [sic] the jury deems appropriate."  See (id. at 9).

As indicated above, the events Coit describes in his complaint allegedly occurred at SCI Frackville from August to September 2022.  To efficiently summarize Coit's factual allegations, the Court has organized those alleged events by date or period, where discernible from his complaint and attached exhibits.

### 1.    August 1, 2022

Coit arrived at SCI Frackville on May 16, 2022.  See (id. ¶ 1).  On August 1, 2022, he expressed suicidal thoughts to Wergynowic, who replied, "[L]et me see Coit, I don't believe you[,]" and "you are not suicidal[;] your [sic] behavioral."  See (id. ¶ 2).  Coit then began "swallowing foreign objects and cutting himself[,]" to which Wergynowic responded, "go deeper."  See (id.).  Despite Coit's acts and suicidal ideation, he was "never placed in [a Protective Observation Cell ("POC")]."  See (id.).

### 2.    August 9–10, 2022

On August 9, 2022, "due to continuous acts of self[-]harm," Coit was "finally placed in [a] POC."  See (id. ¶ 3).  While in the POC, Coit was speaking with non-party Correctional Officer Wink ("Wink"), who told Coit that he heard that Coit filed a grievance against Wynder and Kephart.  See (id.).  Wink informed Coit that if he did not withdraw the grievance, he was

authorized to spray him with O.C. Spray "for self[-]harm." See (id.). Coit then asked to speak to a lieutenant, but Wink stated that "the only way [he was] going to get a [lieutenant was] if [he] start[ed] hurting [him]self." See (id.). As a result, Coit "began to make it look like he was bitting [sic] himself." See (id.). At that point, Wink told Coit that he would regret it if he did not withdraw his grievance. See (id.). When Coit asked why he would regret it, Wink sprayed him with O.C. Spray. See (id.).

The following day, Coit "was brought back from the [h]ospital," placed in "cuffmitts [sic]," and shackled. See (id. ¶ 4). When Coit, who "has severe asthma" for which he "takes treatment on a daily basis," attempted to "scratch," non-party "Kimmel" sprayed him. See (id.).

### 3.    August 10–16, 2022

Coit "was [then] held in [a] cuff bag [sic] and shackles for six . . . days," until speaking with Marsh on or about August 16, 2022. See (id. ¶¶ 4–5). Coit complained to Marsh about being "sprayed multiple times for no reason." See (id. ¶ 5). Marsh responded by informing Coit that if he wanted his help, he needed to withdraw another action he filed, Coit v. Wynder, No. 22-cv-01277 (M.D. Pa. filed Aug. 16, 2022). See (id.). Marsh admonished Coit that if he did not withdraw this case, "things [were] going to get worse." See (id.).

### 4.    August 17, 2022

On or about August 17, 2022, Coit's status changed from "POC to Recovery Status," and he was placed in "a cell with no mattress, no smock[,] and no blanket." See (id. ¶ 6). He was "completely . . . nude," had his water cut off, "covered in feces," and "denied call cleaning." See (id.). Coit alleges that he "has not had yard, showers, toilet paper, [or m]ental [h]ealth [t]reatment for over 36 days," despite having a "stability D-Code" requiring him to have 20 hours out of his cell. See (id.).

### 5.    August 19, 2022

On or about August 19, 2022, Wergynowic, Kephart, Wynder, Britton, Snyder, Malishik, and Marsh "all agreed to withhold all of [Coit's] legal mail" from Huntingdon County.  See (id. ¶ 7).  As a result, Coit was "denied access to the law library[,] access to his lawyer[,] and access to the courts."  See (id.).  Coit also alleges that he was also "denied the opportunity to file grievances and possibly exhaust any possible remedies."  See (id.).

### 6.    August 24, 2022

On August 24, 2022, Coit was confined to his cell when non-party "Ramer" approached him and told him to "give up all [his] clothes."  See (id. ¶ 17).[1]  He also told Coit that he had permission from "Central Office and the Deputies" for his request.  See (id.).  Coit complied, and he was left naked in his cell and had to sleep on a metal bed frame for three days.  See (id.).

### 7.    August 28, 2022

On August 28, 2022, Coit wrote "several request slips" to Defendants and did not receive responses to his requests.  See (id. ¶ 18).  It appears that Coit sent three Inmate's Request to Staff ("Inmate Requests") on this date.  The first Inmate Request is directed to the Program Review Committee ("PRC"), and requests to "know what part of [DOC Policy Statement 13.8.1: Access to Mental Health Care] authorizes [a] temporary removal [from the Behavioral Management Unit ("BMU")] to start [a] step-down program" and asks for copies of "any and all policies in regards to BMU step-downs."  See (id. at 15).  The second Inmate Request is directed to "Wergz" and requests "to know who authorized [his] removal of [sic] BMU status to initae [sic] a step[-]down

---

[1]  Coit attaches a Misconduct Report dated August 24, 2022 to his complaint.  See (id. at 11). The Report indicates that Coit was charged with "[d]estroying, altering, tampering with, or damaging property" in violation of DOC Charge 38.  See (id.).  The staff member who prepared the Report stated that, inter alia, Coit "destroyed a state[-]issued [a]nti-suicide smock."  See (id.).

4

protocol that does not fit BMU policy." <u>See</u> (<u>id.</u> at 16).  The third Inmate Request is also directed to "Wergz" and requests "a copy of step-down [sic] and . . . the 13.8.1 [indiscernible] to step[-]down phase."  <u>See</u> (<u>id.</u> at 17).[2]

### 8.    Unknown Dates in August 2022

Coit also alleges that two additional events occurred "[s]ometime in August [2022]."  <u>See</u> (<u>id.</u> ¶¶ 8–9).  First, Coit "was written up for sending a message of possible escape," despite him not being "on the kiosk at 6:48 a.m." and had previously reported that other inmates have his email information.  <u>See</u> (<u>id.</u> (citing <u>Coit v. Wynder</u>, No. 22-cv-01277)).  Second, Defendants held a meeting during which they determined to temporarily remove Coit from BMU status and "initiat[e] an illegal step-down."  <u>See</u> (<u>id.</u> ¶ 9).  Defendants also prepared a memorandum relating to the step-down which "discloses a complete violation and waver [sic] of several DOC policies."  <u>See</u> (<u>id.</u>).  These violations included, <u>inter alia</u>: (1) denying Coit showers, soap, meals, water, and toilet paper; (2) leaving Coit inside his cell "with [b]lood and feces on the wall"; (3)

---

[2]  Coit attaches a fourth, undated Inmate Request that he appeared to prepare in August 2022. <u>See</u> (<u>id.</u> at 18).  It is unclear if Coit also refers to this Inmate Request because non-party Robert Boyce responded to it on August 30, 2022.  <u>See</u> (<u>id.</u>).

In this Inmate Request, Coit requests information about the individual "who authorized the safety and security plan and what section of [DOC Policy 13.8.1] it falls under."  <u>See</u> (<u>id.</u>).  Mr. Boyce responded to the Request as follows:

> As per our discussion on 8/29/22, cell side, please review the inmate request that [a]ccompanied this specific request.  You remain a BMU resident and have never been removed or [d]ischarged from the BMU.  Should you have any concerns regarding your safety plan, your IRP, or the rationale for security measures that have been implemented, PRC will be scheduled every 30 days.  I am available weekly, daily[,] and per your request.  Thank you for your assistance on this matter.

<u>See</u> (<u>id.</u>).

5

allowing staff to "apply force on four pointed [sic] inmates"; and (4) denying Coit the

opportunity to file grievances and complaints.  See (id.).

### 9.    September 5–21, 2022

On or about September 5, 2022, Coit was experiencing mental health issues and "began

to bite holes in his arm[] and covering [his] cell in feces."  See (id. ¶ 10).  The next day, Ramer

stripped Coit of all his clothing and left him naked in his cell until September 8, 2022.  See (id. ¶

19).  On or about September 9, 2022, Coit "was in the cell butt naked" when non-party Mohl told

him to "cuff up."  See (id. ¶ 20).  Coit "complied and was [p]araded through the [h]allway butt

naked."  See (id.).  Mohl told Coit he could do what he wanted because he had "approval from

[the] Central Office and the Deputies."  See (id.).

By September 15, 2022, Coit had been confined to his cell for forty-five days with "no

yard [and] no shower," while "engaging [in] self[-]harm and having suicidal thoughts."  See (id.

¶ 21).  He also alleges that he was in his cell for at least thirty days "with the light on causing

[him] to lose sleep," without showers, toilet paper, time in the yard, a toothbrush and toothpaste,

and stuck "eating [f]inger food" that "comes in a wax bag."  See (id. ¶¶ 10–14, 16).  He further

alleges that he was confined to his cell for seven days "with feces and blood on the walls."  See

(id. ¶ 15).

### a.    Misconduct Reports

Coit attaches two additional Misconduct Reports to his complaint.  The first of those

Reports, dated September 15, 2022, indicates that Coit was charged with threatening an

employee with bodily harm (Charge 15); using abusive, obscene, or inappropriate language to or

about an employee (Charge 33); refusing orders (Charge 35); possession of contraband (feces)

(Charge 36); and tampering with property (Charge 38).  See (id. at 12).  The staff member's

version of the events leading to the issuance of the Report were as follows:

> On [September 15, 2022, at approximately 7:30 p.m.,] while this reporting officer was conducting a range of motion exercise in the BMU, I heard Inmate Coit who is housed in cell 3B 1001 yelling obscenities from his cell door and was indicating he was going to attempt to assault staff.  After the conclusion of the exercise period, I reported to the BMU control center where I observed on CCTV Inmate Coit stockpiling feces, barricading his door with his cell contents, and preparing to resist [being] removed from his cell.  I proceeded to cell 3B 1001 to interview [Coit]. [Coit] expressed he was going to attempt to assault staff with the hoarded feces.  I ordered Inmate Coit to come [to] the door to be restrained to which he replied "suck my dick."  I departed from the cell and received authorization to assemble a compliance team to forcibly remove Inmate Coit from his cell to retrieve his properly cell contents and the feces.

See (id.).

The second Misconduct Report, dated September 21, 2022, indicates that Coit was

charged with threatening an employee or their family with bodily harm (Charge 15) and refusing

to obey an order (Charge 35).  See (id. at 13).  The reporting officer described the events

preceding the issuance of the Report as follows:

> On [September 21, 2022, at approximately 11:50 a.m.,] this reporting officer observed Inmate Coit . . . tie a string around his penis.  This Officer ordered Inmate Coit to stop tying the string and to return all clothing and blankets.  He refused all orders given and stated to this officer, "Suit up!  You open that wicket I will throw shit at you!"  This Officer notified main control without further incident.

See (id.).

### b.    Inmate's Requests to Staff

Coit attaches two Inmate Requests, both dated September 20, 2022, to his complaint.  See

(id. at 20, 21).  It does not appear that any SCI Frackville staff member responded to the

requests, and there is no indication that they received those requests.  See (id.).

7

### B.       Procedural History

When Coit submitted his complaint on October 6, 2022, he also filed an application for leave to proceed in forma pauperis ("IFP Application") and prisoner trust fund account statement. (Doc. Nos. 2, 3.)  On November 22, 2022, Coit filed his first motion to appoint counsel, along with a supporting brief and declaration.  (Doc. Nos. 8–10.)  On December 7, 2022, the Court issued an Order which, inter alia, granted the IFP Application and directed the Clerk of Court to send waiver of service forms to Defendants.  (Doc. No. 11.)  Defendants waived service of the complaint approximately two weeks later.  (Doc. No. 14.)

Coit filed a motion for leave to supplement his complaint and a motion for leave to amend or supplement his complaint on January 4, 2023, and January 13, 2023, respectively. (Doc. Nos. 15, 16.)  Defendants then filed a motion on January 31, 2023, in which they requested that the Court extend the deadline for them to respond to Coit's complaint until the Court resolved Coit's motions for leave to supplement and amend his complaint.  (Doc. No. 18.)

On March 9, 2023, the Court issued an Order granting Defendants' motion for an extension of time, staying Defendants' response to Coit's complaint (or possible amended complaint) pending the Court's resolution of Coit's motions to supplement and amend, and denying without prejudice Coit's first motion to appoint counsel.  See (Doc. No. 21 at 2).  On June 29, 2023, the Court issued a Memorandum and Order denying Coit's motions for leave to supplement and amend his complaint, directing that the case would proceed on Coit's original complaint, lifting the stay on Defendants' response to Coit's complaint, and setting a deadline for Defendants to file their response to Coit's complaint.  See (Doc. Nos. 24, 25).

Defendants filed a timely motion to dismiss Coit's complaint under Federal Rule of Civil Procedure 12(b)(6), along with a supporting brief, on July 10, 2023.  (Doc. Nos. 26, 27.)  Coit

responded to Defendants' motion by filing a brief in opposition to the motion, a second motion for leave to amend his complaint, and a brief in support of his motion for leave to amend his complaint on July 31, 2023. (Doc. Nos. 28–30.) Defendants filed a brief in opposition to Coit's second motion for leave to amend his complaint on August 14, 2023. (Doc. No. 31.)

Prior to the Court resolving Defendants' motion to dismiss or Coit's motion for leave to amend, Coit filed a third motion for leave to file an amended complaint and supporting brief on October 26, 2023. (Doc. Nos. 34, 35.) Defendants filed a brief opposing Coit's third motion for leave to amend on November 6, 2023. (Doc. No. 36.) Two weeks later, Defendants filed a motion to stay discovery pending the Court's resolution of the parties' pending motions, along with a supporting brief. (Doc. Nos. 37, 38.) On February 8, 2024, Coit filed his second motion to appoint counsel and a supporting brief. (Doc. Nos. 41, 42.)

On March 29, 2024, the Court issued a Memorandum and Order which, inter alia: (1) denied Coit's second and third motions for leave to file an amended complaint; (2) granted part of Defendants' Rule 12(b)(6) motion to dismiss to the extent that they sought dismissal of Coit's (a) Eighth Amendment claims relating to non-defendants or unidentified individuals, (b) First Amendment claim for denial of access to the courts, (c) First Amendment claim for violating his right of intimate association, and (d) First Amendment retaliation claim against Britton, Snyder, and Malishik; (3) denied Defendants Rule 12(b)(6) motion to dismiss to the extent that they sought dismissal of Coit's (a) entire complaint for failure to exhaust his administrative remedies, (b) Eighth Amendment claim against Wergynowic relating to the incident on August 1, 2022, (c) Eighth Amendment claim against all Defendants based on the August 2022 "memo" and September 2022 conditions of confinement, (d) First Amendment retaliation claim against Marsh, and (e) Fourteenth Amendment due process claim against all Defendants concerning the

August 2022 "memo" and September 2022 conditions of confinement; (4) granted Coit leave to

file an amended complaint or inform the Court that he wanted to proceed on his remaining

claims in his original complaint within thirty days; (5) explained that if Coit failed to file an

amended complaint or letter within thirty days, the case would proceed on only Coit's (a) Eighth

Amendment claim against Wergynowic concerning the August 1, 2022 incident, (b) Eighth

Amendment claim against all Defendants regarding the August 2022 "memo" and September

2022 conditions of confinement, (c) First Amendment retaliation claim against Marsh, and (d)

Fourteenth Amendment due-process claim against all Defendants; (6) denied Coit's second

motion to appoint counsel; and (7) denied Defendants' motion to stay discovery.  See (Doc. Nos.

43, 44).  Two days later, Defendants filed a motion requesting that the Court reconsider the

denial of their motion to dismiss to the extent they sought dismissal of Coit's First Amendment

retaliation claim against Marsh, and they also filed a supporting brief.  (Doc. Nos. 45, 46.)  On

April 22, 2024, Defendants filed their answer to Coit's complaint.  (Doc. No. 48.)

Coit neither filed an amended complaint nor a letter within thirty days; as such, this case

proceeded to discovery on the above-referenced remaining Section 1983 claims.  On September

11, 2024, Defendants filed a motion for leave to depose Coit.  (Doc. No. 50.)  Approximately a

month later, Defendants filed a motion for leave to file bifurcated motions for summary

judgment on administrative exhaustion and the merits of Coit's claims, a brief in support of their

motion to file bifurcated summary judgment motions, a motion to amend their answer to include

affirmative defenses, and a brief in support of their motion to amend their answer.  (Doc. Nos.

51–54.)  Coit filed a brief in opposition to Defendants' motion to file bifurcated motions for

summary judgment on November 21, 2024 (Doc. No. 55), and Defendants filed a reply brief in

further support of their motion to file bifurcated summary judgment motions on November 25, 2024 (Doc. No. 56).

On March 18, 2025, the Court issued two Orders resolving the parties' pending motions. (Doc. Nos. 57, 58.)  In the first Order, the Court denied Defendants' motion for reconsideration. See (Doc. No. 57 at 8).  In the second Order, the Court, inter alia: (1) granted Defendants' motion for leave to take Coit's deposition; (2) denied Defendants' motion for leave to file bifurcated motions for summary judgment; (3) granted Defendants' motion for leave to amend their answer to include affirmative defenses; (4) set a deadline for Defendants to file their amended answer; and (5) established new discovery and dispositive motions deadlines.  See (Doc. No. 58 at 3).  On the same date, Defendants filed their amended answer with affirmative defenses.  (Doc. No. 59.)

Defendants filed the instant motion for summary judgment, supporting brief, statement of undisputed material facts, and appendix of exhibits on July 9, 2025.  (Doc. Nos. 65–68.)  On August 6, 2025, Coit filed a brief in opposition to Defendants' motion for summary judgment and answer to their statement of facts.  (Doc. Nos. 70, 71.)  Defendants did not file a reply brief; as such, their motion for summary judgment is ripe for disposition.

C.      Factual Background[3]

1.        The DOC's Administrative Remedy Procedures (DC-ADM 804)

The DOC's grievance policy is DC-ADM 804, the current version of which has been in effect since May 1, 2015.  See (Doc. No. 68-1).  Under DC-ADM 804, the DOC requires every

---

[3] The Court thanks the parties for their detailed summary judgment submissions relating to the facts attendant to Coit's Section 1983 claims in this case; however, because the Court concludes that summary judgment in favor of Defendants is warranted because Coit failed to exhaust his administrative remedies before filing this action, the Court limits this factual background to only those facts relevant to the exhaustion issue.

inmate in its custody to "have access to a formal procedure" through which they can "seek resolution of problems or other issues of concern arising during the course of [their] confinement." See (id. at 1). The DOC's formal procedure is comprised of three steps. See (id.).

The first formal step requires the inmate to submit a written grievance to the Facility Grievance Coordinator/designee within fifteen working days "after the event upon which the claim is based." See (id. at 5).[4] The inmate's grievance must: (1) provide a statement of facts that "include[s] the date, approximate time, and location of the event(s) that gave rise to the grievance" and "identif[ies] individuals directly involved in the event(s)"; (2) "specifically state any claims [the inmate] wishes to make concerning violations of [DOC] directives, regulations, court orders, or other law"; and (3) "request the specific relief sought" if "the inmate desires compensation or other legal relief normally available from a court." See (id.).

If the inmate cannot comply with the fifteen-day deadline to file their grievance, they can file a request for an extension of time with the Grievance Coordinator/designee in which the inmate notifies them "of the reason for the delay." See (id. at 9). Upon receipt of an inmate's request for an extension of time to file their grievance, the Grievance Coordinator/designee will consider the request "on a case-by-case basis" and will:

consider the reason given and . . . if the delay was caused by:

a. a temporary transfer from the facility where the grievance should have been filed;

b. a permanent transfer to another facility from the facility where the grievance should have been filed;

c. Authorized Temporary Absence (ATA) for an extended period;

---

[4] DC-ADM encourages, but does not require, inmates to attempt an informal resolution of an issue with the appropriate staff member before filing a formal grievance. See (id. at 4).

d. another delay with mail delivery; or

e. any other reason the Facility Grievance Coordinator/designee deems appropriate.

See (id.).  If the Grievance Coordinator/designee "determine[s] that a delay was caused by [any of the above] circumstance[s] . . ., a reasonable extension of time for filing shall be permitted." See (id.).

For the second step, the inmate must appeal a Grievance Coordinator/designee's initial review response/rejection to the Facility Manager/designee within fifteen working days from the date of the initial review response/rejection.  See (id. at 15).  For the third step, if the inmate "is dissatisfied with the disposition of an appeal from the Facility Manager/designee," they must "submit an Inmate Appeal to Final Review" to the DOC Secretary's Office of Inmate Grievance Appeals ("SOIGA") within fifteen working days of the date of the Facility Manager/designee's decision.  See (id. at 18).

### 2.    Coit's Use of the DOC's Administrative Procedures

Coit is aware of and has used the DOC's grievance procedure as evidenced by his extensive grievance history.  See (Doc. Nos. 66 ¶ 18; 71 ¶ 18).  From May 16, 2022, to December 31, 2022, Coit filed forty-two grievances.  See (Doc. Nos. 68-2 at 1; 66 ¶ 19).[5]

---

[5]  In Defendants' statement of undisputed material facts ("SOF"), they indicate that Coit filed thirty-eight grievances from January 1, 2022, until December 31, 2022.  See (Doc. No. 66 ¶ 19). Coit did not respond to this statement in his answer to their SOF.  See (Doc. No. 71 at 2, 6).  As such, the Court considers Coit to not contest this statement pursuant to Local Rule 56.1.

Nevertheless, the Court notes that Defendants include a list of Coit's grievances from May 16, 2022, through January 31, 2023, in their appendix, and this document appears to show that Coit filed forty-nine grievances during this period, forty-two of which he filed in 2022.  See (Doc. No. 68-2 at 1).  Thus, the Court considers Coit to have filed forty-two grievances during the relevant period instead of thirty-nine as indicated by Defendants, even though the ultimate number is irrelevant to the Court's resolution of Defendants' argument relating to administrative exhaustion.

Overall, Coit has filed 725 grievances during his incarceration with the DOC.  <u>See</u> (Doc. Nos. 66 ¶ 19 n.1; 71 ¶ 19).[6]

In his complaint, Coit admits that he did not "fully exhaust[ his] administrative remedies regarding each of [his] . . . claims" in this case.  <u>See</u> (Doc. Nos. 1 at 2; 66 ¶ 20).  He claims, however, that he could not exhaust his administrative remedies because he was "denied [g]rievances."  <u>See</u> (Doc. Nos. 1 at 2; 66 ¶ 21).

Coit elaborated on this assertion during his deposition on October 3, 2024.  <u>See</u> (Doc. Nos. 68-3; 66 ¶ 22; 71 ¶ 22).  Coit testified that he could not file any grievances from August 8, 2022, until approximately October 20, 2022, because he "wasn't allowed to have a pen or paper or grievances" during his "plan of action."  <u>See</u> (Doc. Nos. 68-3 at 53–54, 96–97; 66 ¶ 23; 71 ¶ 23).  He assumed that he could not have a pen because prison officials were "under the impression [that he would] engage in self-harm."  <u>See</u> (<u>id.</u> at 54).

Once Coit had access to the materials he would have needed to file a grievance, such as a pen, which occurred on or about October 20, 2022, he did not file a grievance relating to the events alleged in his complaint.  <u>See</u> (<u>id.</u> at 97–98).  He asserted that there was "no need" for him to file a grievance at that time because "[<u>Ross v. Blake</u>, 578 U.S. 632 (2016)] enacts [sic] a procedural default aspect, once you fail to comply with your procedures."  <u>See</u> (<u>id.</u> at 98).  In other words, Coit believed that he did not have to file a grievance once he had access to a pen and grievance forms because prison officials did not provide him with access to the materials to file a grievance at the time that the events allegedly occurred or within fifteen days thereafter. <u>See</u> (<u>id.</u>).  Consequently, he did not seek an extension of time under DC-ADM 804 § 1.C.2 to file

---

[6]  It appears that Coit has been incarcerated in DOC facilities since February 22, 2013.  <u>See</u> (Doc. No. 71-6 at 1).

an otherwise untimely grievance relating to the events described in the complaint after the fifteen-day deadlines passed.  <u>See</u> (Doc. Nos. 66 ¶ 25; 71 ¶ 25).

## II.    LEGAL STANDARDS

### A.    Motions for Summary Judgment

The Court must render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  <u>See</u> Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of material fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  <u>See</u> <u>id.</u> at 248; <u>Gray v. York Newspapers, Inc.</u>, 957 F.2d 1070, 1078 (3d Cir. 1992).  A dispute of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>See</u> <u>Anderson</u>, 477 U.S. at 257.  When determining whether there is a genuine dispute of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party. <u>See</u> <u>id.</u> at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [their] favor.").

To avoid summary judgment, the nonmoving party may not rest on the unsubstantiated allegations of their pleadings.  When the party seeking summary judgment satisfies their burden to demonstrate the absence of a genuine dispute of material fact, the burden of production shifts to the nonmoving party, who must "go beyond the pleadings" with affidavits, "depositions, answers to interrogatories, and the like" to show specific material facts giving rise to a genuine

dispute.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); id. at 328 (White, J.,

concurring).  The nonmoving party "must do more than simply show that there is some

metaphysical doubt as to the material facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio

Corp., 475 U.S. 574, 586 (1986) (citation omitted).  Instead, they must produce evidence to show

the existence of every element essential to their case that they bear the burden of proving at trial,

for "a complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial."  See Celotex Corp., 477 U.S. at 323; see also

Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992) (explaining that since plaintiff had the

burden of proof, "he must make a showing sufficient to establish the existence of every element

essential to his case" (citations omitted)).

As noted supra, when determining whether a dispute of material fact exists, the Court

must consider the evidence in the light most favorable to the non-moving party.  See Matsushita

Elec. Indus. Co., 475 U.S. at 588 (citation omitted).  In doing so, the Court must "accept the non-

movant's allegations as true and resolve any conflicts in [their] favor."  See White v.

Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988), abrogated on other grounds by Hazen

Paper Co. v. Biggins, 507 U.S. 604 (1993).  However, a party opposing a summary judgment

motion must comply with Local Rule 56.1, which specifically directs the oppositional party to

submit a "statement of the material facts, responding to the numbered paragraphs set forth in the

statement required [to be filed by the movant], as to which it is contended that there exists a

genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the

statement required to be served by the moving party will be deemed to be admitted."  See L.R.

56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact

that they are a pro se litigant because these rules apply with equal force to all parties.  See Mala

16

v. Crown Bay Marina, Inc., 704 F.3d 239, 245 (3d Cir. 2013) (noting that pro se parties "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants").

Even if the Court deems the facts in the moving party's submission to be admitted due to the nonmoving party's failure to comply with Local Rule 56.1, the Court cannot simply grant the motion for summary judgment as unopposed.  Instead, the Court can only grant the motion if the Court "find[s] that judgment for the moving party is 'appropriate.'"  See Anchorage Assoc. v. V.I. Bd. of Tax Rev., 922 F.2d 168, 175 (3d Cir. 1990).  The analysis for determining whether judgment is "appropriate" depends on whether the party moving for summary judgment bears the "burden of proof on the relevant issues":

> Where the moving party has the burden of proof on the relevant issues, this means that the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law.  Where the moving party does not have the burden of proof on the relevant issues, this means that the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law.

See id. (citing Celotex Corp., 477 U.S. 317).

## B.     Section 1983

Section 1983 is the statutory vehicle by which private citizens may seek redress for violations of federal constitutional rights committed by state officials.  See 42 U.S.C. § 1983.  This statute states, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

See id.  "Section 1983 is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors."  See Pappas v. City of

17

Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) (quoting Gonzaga Univ. v. Doe, 536 U.S.

273, 284–85 (2002)).  "To state a claim under § 1983, a plaintiff must allege the violation of a

right secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law."  West v. Atkins, 487

U.S. 42, 48 (1988).

### C.    Exhaustion of Administrative Remedies Under the PLRA

The PLRA states that "[n]o action shall be brought with respect to prison conditions

under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility

until such administrative remedies as are available are exhausted."  See 42 U.S.C. § 1997e(a).

Stated differently, the exhaustion of available administrative remedies is a prerequisite for a

prisoner asserting a claim under Section 1983 regarding their prison conditions.  See Rinaldi v.

United States, 904 F.3d 257, 265 (3d Cir. 2018); see also Ross, 578 U.S. at 638 (reiterating that

the PLRA's "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more

conversationally, may not bring any action) absent exhaustion of available administrative

remedies" (quoting Woodford v. Ngo, 548 U.S. 81, 85 (2006))); Jones v. Bock, 549 U.S. 199,

211 (2007) (stating that "[t]here is no question that exhaustion is mandatory under the PLRA and

that unexhausted claims cannot be brought in court" (citation omitted)); Booth v. Churner, 532

U.S. 731, 733–34 (2001) (stating that the PLRA "now requires a prisoner to exhaust 'such

administrative remedies as are available' before suing over prison conditions" (quoting 42

U.S.C. § 1997e(a))).

"The PLRA requires proper exhaustion, meaning 'complet[ing] the administrative review

process in accordance with the applicable procedural rules.'"  Downey v. Pa. Dep't of Corr., 968

F.3d 299, 305 (3d Cir. 2020) (alteration in original) (quoting Woodford, 548 U.S. at 88).  "These

18

applicable procedural rules are supplied by the individual prisons." Id. (citations omitted); see also Spruill, 372 F.3d at 222 (stating that "the determination [of] whether a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"); Jones, 549 U.S. at 218 (explaining that "[t]he level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim"); Woodford, 548 U.S. at 90 (indicating that "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules").

A prisoner's failure to follow a prison's procedural rules will result in a procedural default of their claims. See Spruill, 372 F.3d at 230–32 (concluding that the PLRA's exhaustion requirement includes procedural default component); see also Drippe v. Tobelinski, 604 F.3d 778, 781 (3d Cir. 2010) (pointing out that Spruill held "that the PLRA includes a procedural default component and the determination whether a prisoner properly exhausted a claim is made by evaluating compliance with the prison's specific grievance procedures"). A procedural default may be excused, however, if the prisoner can show that the administrative remedies were unavailable to them. See Rinaldi, 904 F.3d at 266 ("The PLRA requires only 'proper exhaustion,' meaning exhaustion of those administrative remedies that are 'available.'" (quoting Woodford, 548 U.S. at 93)). "Available means capable of use; at hand." Small v. Camden County, 728 F.3d 265, 271 (3d Cir. 2013) (internal citations and quotation marks omitted). "An administrative remedy is unavailable when it 'operates as a simple dead end[,] . . . is so opaque that it becomes, practically speaking, incapable of use, or when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'" Downey, 968 F.3d at 305 (alterations in original) (quoting Shifflett v.

19

Korszniak, 934 F.3d 356, 365 (3d Cir. 2019)).  "Although the availability of administrative remedies to a prisoner is a question of law, it necessarily involves a factual inquiry."  Small, 728 F.3d at 271.

The failure to exhaust available administrative remedies "is an affirmative defense under the PLRA."  See Jones, 549 U.S. at 216.  As such, "[t]he burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant."  See Rinaldi, 904 F.3d at 268 (citing Ray v. Kertes, 285 F.3d 287, 295 (3d Cir. 2002)).  However, "once the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to [them]."  See id. (citation omitted).

Finally, requiring a prisoner to exhaust available administrative remedies before filing suit in federal court advances the policy justifications of the PLRA, i.e., to "return[] control of the inmate grievance process to prison administrators, encourag[e] the development of an administrative record, and perhaps settlements, within the inmate grievance process, and reduc[e] the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits."  See Downey, 968 F.3d at 305 (citation and internal quotation marks omitted); Jones, 549 U.S. at 204 (explaining that exhaustion requirement "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court").  It also "reduces any incentive that prison officials otherwise might have to use threats to prevent inmates from exhausting their administrative remedies and thereby safeguards the benefits of the administrative review process for everyone."  See Rinaldi, 904 F.3d at 268 (citation and internal quotation marks omitted).

20

### III.    DISCUSSION

In their motion for summary judgment, Defendants argue that, <u>inter alia</u>, the Court should grant summary judgment in their favor because Coit failed to fully exhaust his administrative remedies under the PLRA prior to filing this action.  <u>See</u> (Doc. No. 67 at 7, 9–14).  The Court agrees.

### A.    The Parties' Arguments

Defendants point out that Coit admits in his complaint and his deposition that he never filed a grievance pertaining to the events alleged in his complaint; claims that the DOC's grievance process was unavailable to him because he did not have access to a pen, paper, or grievance forms during at least August and September 2022; and acknowledges that once he obtained forms and a pen, he did not file grievances because he believed that prison officials would reject or deny any such grievance as untimely.  <u>See</u> (<u>id.</u> at 11–12).  Defendants contend that Coit cannot "unilaterally decid[e] that his participation in the grievance process would be futile[; instead, he] must engage in the grievance process and seek an extension of time to do so if his grievances would be untimely when filed."  <u>See</u> (<u>id.</u> at 12).  They note that that Third Circuit Court of Appeals has rejected the exact argument Coit asserts here—that he did not need to seek an extension of time to file an otherwise untimely grievance—concluding that a prisoner's failure to seek such an extension results in their failure to exhaust their administrative remedies under the PLRA.  <u>See</u> (<u>id.</u> at 12–14 (citing <u>Talley v. Clark</u>, 111 F.4th 255, 263–64 (3d Cir. 2024)).  They further note that, despite Coit's allegation about lacking grievance forms and a pen, he submitted a grievance (No. 993958) dated August 15, 2022, on August 17, 2022, which was denied and not appealed to final review with SOIGA.  <u>See</u> (<u>id.</u> at 13 (citing Doc. No. 68-4)).

21

Coit's response to Defendants' exhaustion argument contains many pertinent recitations of the applicable law; however, he addresses exhaustion over the course of fourteen handwritten pages organized in no discernible order, containing many repetitive statements, and asserting numerous reasons why the Court should deny Defendants' motion on PLRA exhaustion. See (Doc. No. 70 at 6–19).[7] As such, it is difficult to ascertain the precise nature of all his opposition arguments. Nevertheless, the Court understands Coit's opposition arguments to be as follows.

First, Coit argues that DC-ADM 804 is "flawed and misused by the [DOC]." See (id. at 6). Coit believes that this policy "does not address what an inmate is to do should [they] not receive a response at any stage in the process" See (id.). In addition, he asserts that "statistically speaking[,] the [DOC's] grievance system . . . provides no relief[. I]n fact[,] grievance officers use the grievance scenario training sheet to find ways to deny grievances." See (id.). He also complains that:

> There is no means by which an inmate can file an amended complaint, file a grievance if [n]ew facts should come to light after the 15[-]day deadline[ because] duplicate grievances or later grievances are denied or rejected as "frivolous[." T]here are no provisions in the grievance system for discovery, for an inmate to conduct an investigation into staff actions[,] and there are no provisions to look into [DOC] policies, practices or procedures.

See (id. at 11).

Second, Coit contends that despite him "going above his duties to file and comply with [DC-ADM 804]," Defendants' "own methods . . . caused [his] non-compliance with the PLR[A]." See (id.). He points out that he "submitts [sic] months of grievances, requests slips, and letters to [SOIGA] asking about the status of his grievances, appeals, and return copies to no availability [sic]." See (id.). He indicates that he "has provided the courts [sic] with numerous

---

[7]  It almost appears as if Coit drafted this section of his opposition brief on different dates but without attempting to coordinate his writing.

request slips[,] . . . grievances[, and] . . . letters to [SOIGA]" in which he "inquir[ed] about no responses to [his] grievance [sic], or delayed responses to grievances submitted." See (id. at 9, 13 (citations omitted)).[8]  He also asserts that:

> [D]efendants [sic] stonewalling tactics by not responding to grievances or by denying grievance responses past [his] 15[-]day deadline caused [his] default[.] Plaintiff appealed grievances he received responses to . . . and facility appeals . . . . Plaintiff wrote grievance officers, facility manager, grievance coordinator[,] and [SOIGA a]sking about grievance responses and appeals and despite Plaintiff informing [D]efendants of lack of responses, [they] failed to provide Plaintiff with a single response.  Plaintiff also reported these acts to the [D]efendants under [DC-ADM] 001 inmate abuse and [n]ever received an outcome for [f]iled abuse allegations[.]  Plaintiff was never given any [n]otice of time extensions and in accordance with [DC-ADM] 804[,] an inmate cannot appeal prior to receiving a response.

See (id. (internal citations omitted)).[9]

Third, Coit argues that Defendants "have shown that they did everything in their power to prevent [him] from exhausting [b]y denying [him] grievances, pens[,] or other opportunities to file grievances," which was due in large part to the plan of action in place for him. See (id. at 10, 11, 18–19).[10]  He contends that "after months of waiting[, he] submitted a grievance in regard to no responses." See (id. at 13).  He also indicates that, due to his status as a Level Five Housing

---

[8]  Coit cites to exhibits #1 through 4 in his brief.  See (id. at 9, 13).  There are no exhibits bearing those numerals attached to either his complaint or answer to Defendants' statement of undisputed material facts.  See (Doc. Nos. 1 at 11–21; 71-1–71-21).  More specifically, the exhibits Coit attaches to his complaint are not labeled as exhibits, see (Doc. No. 1 at 11–21), and the exhibits he attaches to his answer to Defendants' statement of undisputed material facts are labeled alphabetically.  See (Doc. Nos. 71-1–71-21).  Although Coit fails to properly identify the evidence in the record supporting his argument here, the Court will consider all exhibits he attaches to his complaint and answer to Defendants' statement of undisputed material facts.

[9]  Coit again cites to exhibits that are not in the record in this matter.  See (id. (citing to exhibits #5, #6)).

[10]  Although Coit asserts that he submitted a declaration "stating he was denied grievances, a pen, or assistance from [a] certified peer specialist in submitting grievances," see (id. at 11), the Court has not located any such declaration attached to his summary judgment submissions.

23

Unit Inmate, "once [he is] locked inside the cell [his] only option is to give staff [his] mail." See (id.). As such, he asserts that his "papers are at the sole mercy of [correctional officers] collecting and distributing mail, requests slips[,] and grievances." See (id. at 13). Moreover, DOC policy does not "mandate" that he "go on an adventure to go looking and asking about responses," and DC-ADM 804 does not permit another prisoner to submit a grievance on his behalf. See (id. at 13, 18). He also was not obligated to "wait it out" to file a complaint since he "was in danger" from physical and mental attacks. See (id. at 13).

Finally, Coit contends in his answer to Defendants' SOF that he never submitted Grievance No. 993958 on August 17, 2022. See (Doc. No. 71 at 7 ¶ 10). He claims that this grievance "is not in [his] handwriting." See (id.). Yet, he also asserts that this grievance did "name . . . Marsh, Wynder, and Kephart in regards to [the] claims of [sic] this complaint, such as denials of showers, water, mattress, and blanket." See (id.).

## B.    Analysis

Defendants have demonstrated that there is no genuine issue of material fact as to whether Coit fully exhausted his administrative remedies in this case. The record shows that Coit did not exhaust his administrative remedies relating to his Section 1983 claims in his complaint. Therefore, the burden shifts to Coit to show that the DOC's administrative remedies were unavailable to him. See Rinaldi, 904 F.3d at 268 ("[O]nce the defendant has established that the inmate failed to resort to administrative remedies, the onus falls on the inmate to show that such remedies were unavailable to [them]." (citation omitted)). Coit has failed to identify any evidence creating a triable issue of fact as to whether his administrative remedies were unavailable to him.

24

Initially, the Court notes that Coit attaches, inter alia, the following exhibits to his answer to Defendants' SOF: (1) notes detailing his self-injurious, verbally assaultive, physically assaultive, obscene, and destructive behavior from May 15, 2022 through October 4, 2022, see (Doc. Nos. 71-1 at 1–2; 71-3 at 1–2); (2) the steps prison officials take (through a step-down plan) to reintegrate items such as a mattress, blanket, clothing, and personal hygiene items into Coit's cell following his personally destructive, assaultive, or self-injurious behavior, see (Doc. No. 71-2 at 1); (3) a confidential DOC Security Advisory dated July 5, 2022 about Coit which indicates, among other things, that (a) he is a "custody level 4 inmate," (b) he has one hundred and twenty-seven misconducts on record, with those misconducts involving "arson, assaults, fighting, refusing to obey orders, using abusive language, presence in an unauthorized area, threatening employees, breaking restriction, destroying property, sexual harassment, indecent exposure, unauthorized use of mail and telephone, and Crimes Code violations," (c) he "has a history of highly assaultive behavior," (d) he "is known for possessing weapons in the past," and (e) "[s]taff should use extreme caution when dealing with [him]," see (Doc. No. 71-6 at 1); (4) a report of an August 20, 2022 email Coit allegedly sent in which he expresses his "plan to get out of jail," which involves getting him a gun that he could use to escape once he is transported to Geisinger Hospital, see (Doc. No. 71-9 at 1–3); (5) numerous changes of his cell assignments, including periods of confinement in POCs from September 2021 through March 2024, see (Doc. No. 71-14 at 1–3); and (6) numerous incident reports, see (Doc. No. 71-19 at 1–29).  Although not conclusive on the PLRA exhaustion issue, the information Coit provides is pertinent to his argument that his administrative remedies were unavailable to him because prison officials did not allow him access to a pen, paper, or grievance forms from August 8, 2022, through approximately October 20, 2022.

Coit's submissions belie his argument that he lacked access to a pen (or other writing instrument) and grievance forms from August 8, 2022, until approximately October 20, 2022. Coit used writing utensils (which appear to have been pens) to prepare his complaint in this case, and he dated his complaint on September 10, 2022. See (Doc. No. 1 at 1–10). He attaches handwritten Inmate Requests, which are dated August 28, 2022, and September 20, 2022, to his complaint. See (id. at 15–21). He also wrote the mailing address and return address on the envelope containing his complaint, and he wrote his IFP Application. See (id. at 22; Doc. No. 2 at 1–3).

Moreover, as Defendants point out in their supporting brief, Coit filed Grievance No. 993958, which was dated August 15, 2022, and which he did not appeal to final review. See (Doc. No. 67 at 13 (citing Doc. No. 68-4)). Although Coit claims that he did not write this grievance, see (Doc. No. 71 at 7), his argument is meritless and, quite frankly, frivolous, and does not create a triable issue of fact because it is plainly obvious from looking at the handwriting on the grievance and Coit's other handwritten documents that he wrote the grievance.[11]

Furthermore, since Coit mentions another case in his complaint, see (Doc. No. 1 ¶ 5), the Court notes that he filed a separate complaint, which the Clerk of Court docketed on August 16, 2022. See Coit v. Wynder, et al., No. 22-cv-01277 (M.D. Pa. filed Aug. 16, 2022). Although Coit dated his complaint in late July 2022, see id., ECF No. 1 at 11, which is prior to the period in which he claims prison officials prevented him from having a pen, he also sent a letter in that

---

[11] The similarities include, inter alia: the way he (1) prints his name, compare (Doc. No. 68-4 at 1), with (Doc. No. 1 at 4 ¶ 1); (2) writes his capital Ws and Ts, compare (Doc. No. 68-4 at 1), with (Doc. No. 1 at 6 ¶ 6); and (3) writes "Cruel and Unusual Punishment," compare (Doc. No. 68-4 at 1), with (Doc. No. 1 at 2).

26

case to the Clerk of Court dated September 26, 2022, which is handwritten, and in which he also complains about not having a pen. See id., ECF No. 9 at 1. Yet, it appears that Coit used a writing instrument to draft this letter. See id.

Overall, although Coit very well might have lacked access to a pen during portions of the period between August 8, 2022, and approximately October 20, 2022, see, e.g., (Doc. No. 71-18 (summarizing meeting between Coit and the Program Review Team and indicating that Coit's request for a writing instrument was forwarded to the BMU Treatment Team and Program Review Committee), he clearly had access to a pen or other writing instrument on other dates during this period. He also managed to access at least one grievance form, which he completed and submitted, despite his contention to the contrary. Therefore, the record unequivocally demonstrates that Coit did not lack access to a pen, grievance forms, or other paperwork throughout the period of August 8, 2022, until approximately October 20, 2022, and, such, Coit has not shown that there is a genuine issue of material fact about the availability of the administrative remedies at SCI Frackville.

Assuming arguendo that prison officials prevented Coit from accessing grievance forms and writing utensils from August 8, 2022, until approximately October 20, 2022, the Court would still determine, based on the Third Circuit's decision in Talley v. Clark, 111 F.4th 255 (3d Cir. 2024), that he failed to exhaust the administrative remedies available to him because he could have, and should have, sought an extension of time to file a grievance from the Grievance Coordinator/designee once he regained access to a pen and grievance forms. In Talley, the plaintiff was a mentally ill DOC prisoner who, after attempting to commit suicide, was placed on suicide watch and confined to a POC for approximately one month at two separate prisons. See

27

111 F.4th at 260.  During this period, the plaintiff "had no access to the grievance forms or writing implements needed to file a grievance."  See id.

Once his confinement in the POC ended, the plaintiff "regained access to the materials needed to file a grievance but did not do so.  Instead[,] he filed [a] pro se action in federal court under 42 U.S.C. § 1983, alleging congeries of claims against numerous defendants . . . ."  See id. at 260–61.  The district court later dismissed the plaintiff's complaint as to all defendants with prejudice because the plaintiff failed to exhaust his administrative remedies under the PLRA. See id. at 261.  The plaintiff appealed from the dismissal of his action to the Third Circuit.  See id.

On appeal, the plaintiff argued, inter alia, that "he had no need to exhaust because administrative remedies were not available to him" for approximately one month, and "that he regained access to grievance forms and writing implements only . . . after the time to file a grievance had expired."  See id. at 262.  In addressing this argument, the Third Circuit noted that DC-ADM 804 allows a prisoner to seek an extension of time to file a grievance, see id. (citing DC-ADM 804 § 1.C.2), and determined that "a prisoner in the Pennsylvania state prison system who had been impeded from filing a grievance [must] seek an extension of time to file such a grievance once the impediment is gone[.]"  See id. at 263.  The Third Circuit explained that:

> Requiring Pennsylvania prisoners to seek an extension to file a grievance pursuant to policy 804 § 1.C.2 serves the important goals of exhaustion.  Crucially, § 1.C.2 is no less an administrative remedy than the grievance itself, the other filing requirements in § 1 with which prisoners must comply, and the appeals process they must pursue under § 2.  Because a request to extend or be excused from the 15-day deadline for filing a grievance is explicitly included as part of the Pennsylvania DOC's grievance procedures, a prisoner must request permission to file an untimely grievance under § 1.C.2 just as he must pursue the grievance itself.  To hold otherwise would render § 1.C.2 of no value in derogation of the PLRA's exhaustion requirement.
>
> . . .

28

> It is true that administrative remedies were temporarily "unavailable" while Talley was on suicide watch without access to writing materials, but that does not excuse his failure to request an extension once he was released and able to complete the necessary forms. . . .  [T]he Pennsylvania DOC has a formal written policy for extensions to which Talley had recourse.
>
> . . .
>
> Requests to extend the 15-day deadline are part of the Pennsylvania prison administrative remedial scheme.  Talley's scenario falls within policy 804 § 1.C.2.e's broad provision of an administrative avenue for relief from the grievance deadline on "any basis."  Talley was thus required to pursue this remedy when the impediment no longer existed . . . .  Because Talley did not do so, he failed to exhaust as required by the PLRA.  To hold otherwise would vitiate the exhaustion requirement whenever a prisoner's severe illness or placement in restrictive confinement for safety concerns temporarily precludes access to the grievance process, which is not an uncommon impediment for Talley.  See, e.g., Talley v. Constanzo, [No. 19-2650,] 2022 WL 17352167, at *2 (3d Cir. Dec. 1, 2022); Talley v. Clark, 851 F. App'x 306, 307 (3d Cir. 2021).  In sum, the PLRA requires "the inmate [to] err on the side of exhaustion," Ross, 578 U.S. at 644, 136 S.Ct. 1850, and Talley did not do so here.

See id. at 263–65.

Here, Coit's argument and factual circumstances are similar to those the Third Circuit addressed in Talley.  Coit asserts that prison officials prevented him from accessing a pen or grievance forms for an extended period, and, as such, he was unable to file grievances within fifteen days of the events alleged in his complaint.[12]  He also argues that he had no duty to exhaust his administrative remedies under DC-ADM 804 because he lacked access to writing instruments and grievance forms.  Additionally, and assuming arguendo that Coit was prevented from accessing a pen or grievance forms for a period of time, once he regained access to writing utensils and grievance forms, he did not seek an extension of time to file a grievance under DC-

---

[12]  The fact that the plaintiff in Talley was placed in a POC for the entire period, whereas Coit spent only a portion of the relevant period in a POC, is of no moment.  In both situations, the plaintiffs' actions led to prison officials placing them under conditions of confinement that allegedly prevented them from accessing writing utensils and grievance forms.

ADM 804 § 1.C.2 and instead filed his Section 1983 complaint in this case. Therefore, Talley controls, and the Court concludes that Coit failed to exhaust his administrative remedies as required by the PLRA when he did not pursue a grievance after any impediment preventing him from filing a timely grievance no longer existed. Accordingly, the Court will grant Defendants' motion for summary judgment due to Coit's failure to exhaust.

## IV.    CONCLUSION

For the reasons stated above, the Court will grant Defendants' motion for summary judgment as to Coit's remaining claims in his complaint, all of which he raises under Section 1983. The Court will also direct the Clerk of Court to enter judgment in favor of Defendants and against Coit and close this case. An appropriate Order follows.


s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania